# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 09 B 5320 |
| | ) | |
| LAKEWOOD ENGINEERING & | ) | |
| MANUFACTURING CO., INC., | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| GREGG SZILAGYI, not individually but | ) | |
| as Trustee of Lakewood Engineering & | ) | |
| Manufacturing Co., Inc., and SUNBEAM | ) | |
| PRODUCTS, INC. d/b/a JARDEN | ) | |
| CONSUMER SOLUTIONS, | ) | Adv. No. 09 A 341 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| CHICAGO AMERICAN | ) | |
| MANUFACTURING, LLC, SCOTT | ) | |
| JACKSON and CHUNGKIN YEE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

On December 17, 2008, Chicago American Manufacturing, LLC ("CAM") and

Lakewood Engineering & Manufacturing Co. ("Lakewood") signed a three page contract

(with a one page exhibit), titled "Supply Agreement." The purpose of the Supply

Agreement was to facilitate the production of certain 20 inch box fans. Lakewood had

manufactured these fans for many years, but in 2008 decided to outsource their

production to CAM.

Execution of the Supply Agreement, and the events that followed shortly

thereafter – an involuntary bankruptcy case filing against Lakewood on February 19,

2009; rejection of the Supply Agreement; and the sale of certain of the Lakewood

bankruptcy estate's assets to a third party – resulted in this litigation, filed on April 20,

2009.

A six day trial was held in September and October 2010 on Counts IV and VI-XI

of the Amended Adversary Complaint (the "Complaint") filed by Gregg Szilagyi, not

individually but as Trustee of Lakewood Engineering and Manufacturing Co., Inc. (the

"Trustee"), and Sunbeam Products, Inc. d/b/a Jarden Consumer Products ("Jarden")

(together, "Plaintiffs") against CAM.  Szilagyi's original co-plaintiff was Wells Fargo

Foothill, Inc. Wells Fargo sought leave to withdraw its claims, however, after Jarden

purchased certain assets of the Debtor.  Jarden was eventually given leave to intervene as

a plaintiff.  Other counts in the Complaint were dismissed earlier by stipulation, including

all counts against former Defendants Scott Jackson and Chungkin Yee.

All of the counts allege that CAM acted wrongfully in its manufacture and sale of

the box fans.  In Counts IV and VI, the Trustee and Jarden allege that CAM infringed

patents.  Counts VII and VIII allege trademark infringement and unfair competition under

the Lanham Act.  Counts IX, X and XI also allege trademark infringement and unfair

competition, but under Illinois common law, the Consumer Fraud and Deceptive

Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act,

respectively.

The court heard eight witnesses[1], including two experts, and reviewed hundreds

of pages of exhibits.

---

[1] References to the witnesses' testimony in this Memorandum Opinion are taken from the trial
transcripts.  The specific lines from the transcript are provided only when the witness is quoted.
    Gregg Szilagyi.  September 15, 2010; pp. 46 - 131.

Having heard the testimony presented in court, reviewed the exhibits admitted into evidence, and analyzed the facts under the applicable law, the court finds in favor of CAM on all counts. Judgment will be entered for CAM, the remaining Defendant, on Counts IV and VI through XI.

## JURISDICTION

Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over bankruptcy cases. The District Court for the Northern District of Illinois referred its bankruptcy cases to the bankruptcy court of this district pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a). When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter orders and judgments in core proceedings within the case.

According to § 157(b)(1), core proceedings arise under Title 11, or in a case under Title 11. The resolution of this particular proceeding concerns the administration of the estate under § 157(b)(2)(A), even though the Trustee sold his claims against CAM to Jarden. This is so because if Jarden prevails, "the estate will share in the litigation proceeds, in the amount of 25% of the net monetary recoveries." Jarden Mot. for Intervention and Related Relief, ECF No. 20, p. 5 at ¶ 17. It is also a core proceeding

---

Jeffrey Skinner. September 15, 2010; pp. 132 - 250.

Jeffrey Martin. September 15, 2010; pp. 255 - 285. September 16, 2010; pp. 9 - 125.

Michele Riley (expert). September 16, 2010; pp. 127 - 292. September 17, 2010; pp. 3 - 27. October 27, 2010; pp. 177 - 206. October 28, 2010; pp. 3 - 90.

Mark Herman. September 17, 2010; pp. 29 - 112.

Bernadette Barron. September 17, 2010; pp. 112 - 177.

Allen Marshall. September 21, 2010; pp. 5 - 146.

Mark Peterson (expert). September 21, 2010; pp. 147 - 254. October 27, 2010; pp. 5 - 175.

under §§ 157(b)(2)(N) ("orders approving the sale of property") and (O) ("other proceedings affecting the liquidation of the assets of the estate").

The Supreme Court recently issued an opinion concerning the jurisdiction of the bankruptcy court. Stern v. Marshall, ___ U.S. ___, 131 S. Ct. 2594 (2011). In Stern v. Marshall, a creditor filed a claim and the debtor filed a counterclaim. Id. at 2601. The dispute before the Court centered on whether the debtor's counterclaim was a "core proceeding" under § 157(b)(2)(C), which includes "counterclaims by the estate against persons filing claims against the estate" in the non-exclusive list of core proceedings at § 157(b)(2). Id. at 2601-02.

The Court determined that although § 157(b)(2)(C) permitted the bankruptcy court to enter a final judgment on the debtor's counterclaim, Article III of the Constitution did not. As Justice Roberts concluded:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

Id. at 2620.

The instant adversary proceeding presents an entirely different procedural posture from Stern v. Marshall. Although CAM filed a proof of claim, the Plaintiffs' claims against CAM are not counterclaims. Indeed, in the "short and plain statement of the grounds for the court's jurisdiction" required by Fed. R. Civ. P. 8, and modified by Fed. R. Bankr. P. 7008(a) to require a statement that the proceeding is core or non-core, the Amended Complaint cites five of the 16 possible categories of core proceedings, but does not include § 157(b)(2)(C).

CAM brought a motion to withdraw the reference from this court, arguing that twelve of the 17 counts in the complaint seek relief for alleged infringement of Plaintiffs' patent and trademark rights. CAM Mot. for Withdrawal of the Reference, <u>Szilagyi et al.</u> <u>v. Chicago American Manufacturing, LLC et al</u>, 09 CV 5779, ECF No. 1. Such rights do not arise under Title 11, which is federal bankruptcy law. The district court denied the motion to withdraw the reference, noting that it was possible that resolution of the issue of the effect of rejection of the Supply Agreement could "resolve, or at least simplify, some or all of the non-bankruptcy issues in the case." Minute Order, 09 CV 5779, ECF No. 14.

That is exactly what transpired. As Plaintiffs anticipated, "the principal issues in the adversary proceeding are whether CAM has a valid license to use certain Lakewood marks and patents under Illinois law and whether any such license was terminated when the Bankruptcy Court approved the rejection of CAM's purported license under 11 U.S.C. § 365." <u>Id.</u> In the end, the district court's prediction was fulfilled; this court is ruling only on claims "derived from or dependent upon bankruptcy law," unlike the state law tort action at issue in <u>Stern v. Marshall</u>. <u>Stern</u>, 131 S. Ct. at 2618.

In the course of this Memorandum Opinion, this court interprets a contract under principles described in Illinois law, and then determines the effect of rejection of that contract under bankruptcy law. Rejection of a contract and the effects thereof are creations purely of bankruptcy law. This action clearly "stems from the bankruptcy itself." <u>Id.</u>

There is a discussion in this Memorandum Opinion of CAM's proof of claim, but only insofar as it relates to whether CAM elected to retain its rights under bankruptcy

law; there are no counterclaims being litigated.  As District Judge Dow stated in denying

CAM's motion to withdraw the reference: "The issues concerning the rejection of the

supply agreement and CAM's asserted license rights under that agreement are core

proceedings."  Minute Order, 09 CV 5779, ECF No. 14.

For all of the reasons described above, this is a core proceeding, and this court has

jurisdiction to enter a final judgment on the complaint.

## FINDINGS OF FACT

The parties agreed to certain stipulated facts prior to beginning the trial.  These

facts are incorporated into the court's Findings of Fact where the court finds them to be

relevant.

### History of CAM and Lakewood

Mark Herman and Jeffrey Skinner have been in the steel business together since

Skinner joined Herman at Blackhawk Steel, a steel service center, in 1987.  Skinner, p.

192.  Herman and Skinner wanted to move from processing into the manufacturing

business.  Herman, p. 31; Skinner, p. 135.  In order to make that move, Herman and

Skinner created CAM in 2005.  They accomplished this by purchasing the assets of a

manufacturer through an assignment for the benefit of creditors.  Herman, p. 31; Skinner,

pp. 134-135.  CAM is owned by Herman (60%), members of Herman's family (30%) and

Skinner (10%).  Skinner, p. 133.

Prior to 2008, Lakewood was one of the three largest manufacturers of box fans in

the United States.  Stipulated Facts, ¶ 1.  Box fans are one of eight or nine different types

of fans within the portable fan marketplace.  Martin, pp. 260-261.  In 2007, between 8

million and 11 million box fans were sold in the United States.  Martin, p. 270.

One of the products Lakewood manufactured was a 20 inch box fan under the Lakewood brand name (the "Lakewood Box Fan"). The standard Lakewood 20 inch box fan was model number 101NS. Lakewood also made a "Rain Guard" 20 inch box fan which had modifications designed to make the fans resistant to the effects of rain. Stipulated Facts, ¶ 2.

Throughout 2008 and until the sale of its operating assets in May 2009, Lakewood owned a series of patents and trademarks relating to Lakewood 20" 101-NS model box fans, including Patent Nos. 5,829,956 and D441,443 (collectively, the "Lakewood Patents") and Trademark Registration Nos. 949,246 (the "Lakewood Trademark"), the validity of which CAM does not dispute. Stipulated Facts, ¶ 3

Herman was familiar with Lakewood through Blackhawk Steel, which used to service the metal frame for Lakewood's box fans. Herman, pp. 32-33.

<u>Lakewood Decides to Outsource Its Box Fan Manufacturing and Chooses CAM as the New Manufacturer</u>

In the summer of 2008, Lakewood made the strategic decision to outsource the manufacturing of certain of its products, including the Lakewood Box Fans. Stipulated Facts, ¶ 5. At the time, Lakewood was losing half a million dollars each month from manufacturing the Lakewood Box Fans. Barron, p. 122. Lakewood had serious discussions with at least three potential manufacturers, including CAM. <u>Id.</u>

CAM reviewed Lakewood's building materials and costs, as well as the labor component of manufacturing the box fans. It observed production at Lakewood's plant. Skinner, p. 195.

Eventually, Lakewood selected CAM to manufacture 20 inch box fans at a cost to Lakewood of $7.19 per fan. Stipulated Facts, ¶ 5; Skinner, pp. 195-196. Several people

were involved in determining the price such that CAM would be paid "cost plus profit

margin that would still come in [low] enough to leave a profit margin for Lakewood."

Barron, p. 129, lines 10-12.

In 2008, manufacturers were selling box fans to retailers in a price range between

$11.90 and $12.25. Martin, p. 271. The price at which these retailers sold fans to the

public was between $14.99 and $19.99, depending on the retailer. Martin, p. 275. The

year 2008 "was the strongest year on record for the fan category." Martin, p. 271, lines

24-25.

Lakewood chose CAM because it had the capacity to manufacture over a million

box fans in a year. Barron, pp. 122-123. Lakewood projected that CAM would

manufacture approximately 1.2 million box fans during this first year. Barron, pp. 126-

127.

The parties agreed that Lakewood would supply the motor and cord set at no cost

to CAM, while CAM would provide all other raw materials and all of the labor. For

$7.19 per fan plus the motor and cord set, Lakewood would receive "a box fan ready to

ship to their customers, packaged and on the slip sheet. So it would load right into the

trucks, and it would be ready to ship." Skinner, p. 196, lines 5-8.

CAM believed that this arrangement was a good business decision because while

box fan production is a labor-intensive, seasonal business, it is a manufacturing business

that is likely to stay within the United States and its construction is not highly

sophisticated. Herman, pp. 34-36.

Each and every one of the Lakewood-branded 20" box fans, made or sold by

CAM read on, or was covered by, at least one valid claim of each of the Lakewood

Patents and bore the Lakewood Trademark.  Stipulated Facts, ¶ 4.

### CAM Prepares For Production and Begins Manufacturing Lakewood Box Fans

In connection with Lakewood's decision to outsource the manufacturing of its 20

inch box fans, certain Lakewood manufacturing equipment was moved to CAM's

facilities, along with the transfer of the designs, specifications, packaging designs and

other information necessary for CAM to make Lakewood-branded 20 inch box fans for

Lakewood.  Lakewood also transferred to CAM parts and materials used in the

manufacture and packaging of 20 inch box fans.  Stipulated Facts, ¶ 6.

Lakewood sent "some of the line guys over there to get the equipment back up

and running on their facility.  The engineering guys went over there, and quality control,

to make sure that the product was being made to the specifications."  Barron, p. 125, line

23 - p. 126, line 2.

In order to accommodate the Lakewood equipment and manufacturing

requirements, CAM changed the entire layout of its facility.  "[W]e had to lay out new

air lines, we had to lay out electrical lines.  We had to . . . buy new equipment, which

included molding machines, which included material-handling apparatus.  We had to hire

new workers.  It was quite involved."  Herman, p. 38, lines 4-9; Skinner, p. 197.  CAM

also hired new employees for the assembly line, and conducted training.  Skinner, p. 198.

Box fans are a seasonal product; retailers want them in the stores in early to mid-

spring.  Manufacturers must ship the box fans starting in November and continue

shipping through late spring.  Skinner, p. 205.  Retailers generally make commitments in

August or September of the previous year for the box fans they intend to sell the next

spring.  Martin, p. 263.

Consequently, Lakewood told CAM that it should be a month ahead in all of its

box fan production.  With this in mind, CAM "invest[ed] in at least 60 days' inventory of

all the parts that were needed. . . .  [W]ith all the investment in the parts and all the

infrastructure changes we had to make, I'm guessing [the total commitment was] around

a million dollars, or a little over a million dollars."  Herman, p. 38, lines 14-15 and 19-22.

Approximately half of that cost was attributable to installing and purchasing the

manufacturing equipment, while the other half was 60 days' worth of materials and

product to produce box fans.  Most of those materials and product were used in the

production of Lakewood Box Fans, and the material-handling apparatus is still being

used for the manufacture of CAM's own fan line.  Herman, p. 93.

Lakewood issued a purchase order to CAM on September 4, 2008, for 20,000 box

fans.  DX 16.  Of those fans, 10,000 were manufactured solely from materials ("the front

grille, the rear grille, the blades") that Lakewood had left over from last season.  Skinner,

p. 203, lines 22 – 23.  The other half of the order was manufactured according to the

arrangement worked out by the parties – Lakewood supplied the motor and cord set, and

CAM supplied the remaining materials and the labor.  Skinner, p. 204.

In September and October, 2008, CAM manufactured an initial batch of

approximately 88,520 20" box fans.  Lakewood purchased 60,760 of these fans during

September and October.  Stipulated Facts, ¶ 7.

On October 17, 2008, at CAM's request, Lakewood issued two purchase orders to

CAM for 20" inch box fans on the following schedule:

| | |
|---|---|
| November 2008 | 3,640 |
| December 2008 | 20,280 |
| January 2009 | 24,440 |
| February 2009 | 67,600 |
| March 2009 | 96,720 |
| April 2009 | 234,000 |

DX 17; Barron, p. 155.  Skinner understood that the purchase orders "formalized" the quantities that Lakewood wanted.  Skinner, p. 244, line 12.

Two separate purchase orders were issued to CAM in order to distinguish fans to be produced for Wal-Mart from those produced for every other retailer.  Skinner, page 206.  The purchase orders indicate that final terms are "TBD" or "to be determined." Barron explained that TBD is on the purchase orders because "this happens to be a canned form that comes out of QuickBooks, and, therefore, there is a box that says, final terms to be determined."  Barron, p. 156, lines 23-25.

In November, 2008, CAM manufactured 47,920 additional 20" box fans. Lakewood did not purchase any fans from CAM during the month of November, 2008. Stipulated Facts, ¶ 8.

<u>CAM and Lakewood Negotiate the Supply Agreement</u>

CAM was concerned about the state of Lakewood's finances.  CAM insured all of its receivables, but eventually, its insurance carrier notified CAM that the carrier would not insure Lakewood's receivables.

> And at that point, we had to have some of our instrument [sic] to protect ourselves.  I was not going to make that kind of investment in this product without having some sort of protection.

> *Q:      From your perspective, what was the primary purpose of the Supply Agreement?*

A:      Well, the primary purpose was to protect – we're getting involved in this huge operation that's going to require us to fulfill all these – this level of production for these box fans, and I wanted to make sure that I wasn't going to be left holding the bag at the end of it.  I wanted to make sure that I was going to get paid for these fans.

Herman, p. 40, lines 8-20.  See Skinner, pp. 212-213.  CAM considered taking a security interest, but determined that negotiating a supply agreement with Lakewood would be the "best option." Herman, p. 89.

Skinner at CAM and Bernadette Barron, who was the CFO at Lakewood, worked together to develop the agreement.  Skinner, p. 138 and pp. 211-212.  Barron is a turnaround professional who was employed at Morris Anderson.  Lakewood retained Morris Anderson, and Barron joined Lakewood as its chief financial officer in late December 2007.  Barron, p. 115.  Barron wrote the first draft of the Supply Agreement, and negotiated with Herman, Skinner and CAM's attorney, Bruce Waldman.  Barron, pp. 130-131.

Barron agreed that it was reasonable to have such an agreement in place to protect CAM, because CAM was making product for a financially troubled company.  "[I]f Lakewood was not able to buy that product, [CAM] needed some assurance that they were not that money out of pocket."  Barron, p. 136, lines 7-10; DX 3.  She talked about this issue with various individuals at Lakewood, including Ken Yee (head of engineering), Scott Jackson (head of sales), John Hitchcock (controller) and Chris Kraus (partial owner).  All agreed that CAM should be given the protection it was requesting -- the ability to sell box fans produced for Lakewood but which Lakewood did not purchase.  Barron, pp. 137-138; DX 4.

Barron emailed CEO Ross for his opinion, and he agreed with the consensus reached by the other Lakewood employees and owner.  Barron, p. 139. To avoid leaving

CAM with a huge inventory of fans that it could not sell because of the Lakewood

trademark, "it was agreed that they could, therefore, turn around and sell the product that

they had on hand to either our [Lakewood's] customers or to any other source so that they

could get their money back." Barron, p. 149, lines 15-18; DX 3 ("[CAM] wants an

agreement they can liquidate their Lakewood inventory in the event there is left over

inventory at the end of the season (or when we crash)".).

Exhibit A to the Supply Agreement is a month by month forecast of the 20" box

fans that Lakewood wanted CAM to manufacture.  This forecast required CAM to

manufacture hundreds of thousands more Lakewood Box Fans, over a longer period of

time, than specified in the October 17 purchase order:

| December 2008 | 20,280 20" Box Fans |
| January 2009 | 24,440 20" Box Fans |
| February 2009 | 119,600 20" Box Fans |
| March 2009 | 100,360 20" Box Fans |
| April 2009 | 230,880 20" Box Fans |
| May 2009 | 372,320 20" Box Fans |
| June 2009 | 239,800 20" Box Fans |
| July 2009 | 74,880 20" Box Fans |
| August 2009 | 42,640 20" Box Fans |

PX 1 and DX 1.

In the event Lakewood could not purchase the already-manufactured Lakewood

Box Fans, or left CAM holding raw materials, CAM wanted to "be able to produce the

fans from the raw material that [it] had, and then be able to sell the fans with a license,

with a broad license." Skinner, p. 215, lines 15-18.

Herman intended to protect CAM with an agreement that "allow[ed] us to produce fans for the forecast. In the event that Lakewood would not be able to pay for those fans, that we would be able to take those fans out to the market and sell them to third parties. . . [I]f, in fact, Lakewood did not purchase the fans within 30 days of [the end of the forecasted month], then we were allowed to sell that portion of the forecasted amount to third parties." Herman, p. 42, lines 6-10 and 14-17.

Barron's understanding of CAM's intent in putting this agreement in place was the same. "The agreement does not say that, but, yes. At the time, I would have thought that [CAM] could complete what they had in hand, because the purpose was that they would not be out of cash as a result of making the fans for us." Barron, p. 151, lines 8-12. See Barron, p. 153, lines 2-5 ("[T]o the extent that they had motors on site, even though they continued to belong to Lakewood, my assumption would be that I was granting them the right to finish making out that line."); and p. 160, lines 11-14 ("[I]t is foreseeable that [CAM] might have had a couple of hundred thousand on hand if they had had enough time to build up to what we wanted in April and May.").

Skinner worked across the table from Barron in drafting the Supply Agreement, and his reading of the Supply Agreement is the same as Herman's and Barron's. "The most important part of this particular [provision] was to give us a license. Since we were producing a Lakewood product, it was critical for us to have a broad license to be able to take the raw materials that we had invested in to make a fan, and then be able to sell that fan." Skinner, page 222, lines 10-15.

Barron did not expect CAM to terminate the Supply Agreement and begin selling to third parties if Lakewood did not purchase a certain month's forecast just one time:

> [L]et's just say in December, we [Lakewood] were supposed to
> buy 20,280, and we did not buy that in December, we did not make up the
> quantity in January, okay, then, yes, they [CAM] would have had the right
> to terminate the agreement.
>
> But if Lakewood was still in business, they would never have done
> that, because had they terminated the agreement, they would not be able to
> make the fans going forward that Lakewood would need.
>
> And so, therefore, from a practical standpoint, even if we had not
> bought that specific amount, they would not have terminated the
> agreement. But, technically, yes, they could have.

Barron, p. 166, line 17 – p. 167, line 5.

The term of the Supply Agreement was for only one year, but the parties had "a

lot of discussions about having a longer-term agreement. And we [at CAM] were led to

believe by the people at Lakewood that there would be no reason not to continue it, as

long as we met our obligations, but they did not want to put it in this agreement."

Herman, p. 48, lines 8-13. CAM hoped that this arrangement would last more than one

year, "because we were making a lot of investment to set this up. There was a lot of – the

installation of equipment, electrical parts, all entailed to get up and running. There was a

lot of one-time costs to get started that we were hoping as time went on we wouldn't have

those costs." Skinner, p. 199, lines 14-20. Lakewood also "intended it to be a longer-

term relationship." Barron, p. 141, lines 10-11.

Barron agreed that the intent of the Supply Agreement was, in part, to allow CAM

to recoup its startup costs if Lakewood failed to buy the forecasted fans and if CAM had

product on hand to sell:

> The intent was that CAM should not have been out of pocket
> because they agreed to supply a financially cash-strapped company.
>
> So to the extent that they had paid money out to get their facility
> up and running, and they had not made that money back through the
> profits of the product that they had sold to Lakewood, then, yes. I would

have said that that was part of the cash that the intent was for them to recoup.

Barron, p. 174, line 19 – p. 175, line 2.

Despite the existence of the Supply Agreement, the partnership with Lakewood was not a profitable venture for CAM.  Herman, p. 70.

<u>Fans That Were Already in Inventory When the Agreement was Signed</u>

At the time CAM entered into the Supply Agreement, it had 70,637 completed 20" box fans (the "2008 Fans") already in inventory.  Lakewood and CAM intended for the 2008 Fans to be covered by the Supply Agreement.  Herman, p. 44, lines 16-19; <u>see</u> Barron, pp. 145, line 22 – p. 146, line 2 ("yes, it would be covered under this, but it wasn't something that would have been separately discussed") and p. 159, line 22 – p. 160, line 1 ("[C]learly, they had some on hand that would be included in these sales, especially since this wasn't even signed until December 17th, and they had already made deliveries to Lakewood for December.").

Although the Supply Agreement was signed in mid-December 2008, the forecast contained fan requirements for December 2008 and January 2009.  CAM needed to manufacture fans well before the month in which their need was forecast "in order to make sure [CAM] had enough finished goods to hit the peak season."  Skinner, p. 221, lines 7-8.  Section B(3) of the Supply Agreement gave CAM the right to manufacture product in advance so that CAM could build up its inventory levels to meet the forecast. Skinner, p. 220; Barron, p. 147.

Lakewood recognized that "CAM's facility was not large enough to make the high-quantity months, for instance, in the month before, and so for – therefore, they determined their own schedule for when they were going to make the product so that it

would be available when we needed it to sell." Barron, p. 127, lines 13-18.  It was

important to produce the fans well in advance of the forecast, "[s]o in case customers

took fans ahead of schedule, or in case their volume increased, that [Lakewood] would be

able to react."  Skinner, p. 202, lines 7-9.

### Obligations Under the Supply Agreement

The Supply Agreement provided that if:

> [CAM] is not in default hereunder, Lakewood agrees to order all of its
> actual requirements for the Product, up to the amounts set forth in the
> forecast, from [CAM] and not from any other supplier or source.

PX 1 and DX 1, Paragraph A(1).

CAM "wanted to make sure that . . . [Lakewood] all of a sudden mid-season

didn't purchase from someone else, or have some reason not to buy from us.  We wanted

to make sure all of their actual requirements were purchased from us since we were

producing to their forecast."  Skinner, p. 217, lines 15 and 17- 21; Barron, p. 142.

CAM is obligated, however, to manufacture according to the forecast in Exhibit

A:

> Supplier shall manufacture, sell and ship product to Lakewood or
> Lakewood's customer in accordance with this Agreement and Lakewood's
> future Purchase Orders consistent with this Agreement.  Lakewood's
> forecast of its requirements for the Product ("Forecasted Products") is
> attached hereto as Exhibit A.

PX 1 and DX 1, Paragraph A(1).

Barron explained why CAM was under this obligation:

> Wal-Mart, who was our largest customer, did not do purchase orders.
> They would merely give you an indication of what they thought they
> might buy, and other customers did the same.  And even those customers
> that would give us a purchase order could obviously change the purchase
> order as they got through the season.

So there was no way that we would know ahead of time actual need until
it had actually transpired.

Barron, p. 143, lines 18-25 – p. 144, lines 1-2.

Herman agreed that this particular product could not be manufactured to an

"actual requirements" standard:

> [A]s a manufacturer, you need to gain some efficiencies, and the only way
> we could do it is to run it the way we have it laid out . . . . To put that kind
> of investment into doing actual, where one month it's this, it's that, you
> cannot – you can't create an efficient flow of product and still expect to be
> able to hit the stores with the amount that they are required to.

Herman, p. 45, lines 19-21; p. 46, lines 1-5.

CAM was "told to focus strictly on this forecast, and it was our responsibility to

make sure that we produced ahead of the forecast. So whatever the sales were on their

end, we were told strictly focus on the forecast, make to the forecast." Skinner, p. 201,

lines 19-24. CAM could not unilaterally decide that Lakewood did not need more fans

"and, therefore, stop making them. . . . They had to make what we requested." Barron,

p. 144, lines 22-24.

Rain Guard Fans

The forecast is not separated into 101NS fans and Rain Guard fans, but requires

only the manufacture of 20" box fans. "There were two styles of 20-inch box fans. . .

[CAM] made both of them at one point or another. . . . There is a 101 NS, which is a 20-

inch box fan, and there's an R225, which is a premium style 20-inch box fan." Skinner,

p. 136, lines 20-21 and lines 24-25; p. 137, lines 2-4. Both the 101NS and the Rain

Guard are 20" box fans. See Stipulated Facts ¶ 2.

The parties' understanding was that Lakewood wanted CAM to manufacture Rain

Guard fans. Barron, p. 125. At the time the agreement was signed, however, Lakewood

didn't know how many or when they would be needed. The number of fans in the forecast that would need to be Rain Guard fans would be communicated at a later date. Skinner, p. 175; pp. 200-201; p. 219; and p. 242; Barron, p. 147, lines 2-3 ("the Rain Guard would have been covered under this agreement"); and pp. 158-159. CAM understood that Rain Guard fans would be a very small portion of Lakewood's purchases. Herman, pp. 86-87.

As early as November 6, 2008 and as late as February 11, 2009, Lakewood requested that CAM manufacture Rain Guard fans for at least one Lakewood customer, and Lakewood provided CAM with materials, specifications and information necessary for CAM to manufacture these Rain Guard fans. Stipulated Facts, ¶ 12. On February 3, 2009, Lakewood provided CAM with a revised forecast that separated out the number of Rain Guard fans. DX 21; Skinner, pp. 239-240.

CAM did not manufacture any Rain Guard fans until June 2009. Skinner, p. 246.

Supplying the Raw Materials

The Supply Agreement also memorialized in writing the agreement that Lakewood was to supply the motors and the cord sets, and that CAM would provide all the other raw materials. PX 1 and DX 1, Paragraph A(2) ("Lakewood shall supply all motors and cord sets needed for the Product at no cost to [CAM]. [CAM] shall secure and provide all other needed materials and labor."). See Barron, p. 152, lines 17-20 ("[A]t the time this agreement was written, it was assumed that we [Lakewood] were supplying the motors and cord sets, which is the expensive parts."). See Barron, p. 171, line 25 – p. 172, line 4 ("So to the extent that they had bought motors and cord sets from us because we [Lakewood] were cash poor, it would have been my intent that they could

have taken those motors and cord sets and finished out that particular run."). See

Skinner, p. 233, lines 13-16 ("[A]ny and all would be including raw materials and the

finished goods. So raw materials to produce a fan, plus all the finished-good fans that

will be on the floor."). The Supply Agreement also included "any parts that were used to

execute this ultimate forecast." Herman, p. 44, lines 24-25.

### CAM Begins Manufacturing Under the Supply Agreement

CAM and Lakewood entered into the Supply Agreement on December 17, 2008.

CAM did not manufacture any additional 20" box fans in December 2008, although

Lakewood purchased 4,960 20" box fans from CAM on December 16, 2008. Stipulated

Facts, ¶¶ 9-11; DX 18. These fans were stored in space CAM rented from Lakewood at

Lakewood's facility. Skinner, p. 208; see Barron, p. 128.

During January 2009, CAM produced 55,040 20" box fans. At the end of January

2009, CAM held at least 125,677 20" box fans in inventory. Stipulated Facts, ¶ 19.

During February 2009, CAM produced an additional 96,220 20" box fans. At the

end of February 2009, CAM held at least 207,457 20" box fans in inventory. Stipulated

Facts, ¶ 20.

On February 3, 2009, the purchasing manager for Lakewood sent an email to

Skinner, revising the forecast originally attached to the Supply Agreement. DX 21;

Skinner, p. 228. This revised forecast separated out fans to be produced for Wal-Mart

from fans to be produced for all other retailers. It also described, for the first time, the

forecasted amounts of Rain Guard fans. Skinner, p. 239. In response to this revised

forecast, CAM made changes to its internal production plan. Skinner, pp. 229-231; DX

22.

On or about February 19, 2009, CAM and Lakewood entered into a barter transaction pursuant to which Lakewood gave CAM 45,360 motors in exchange for 14,469 20" box fans. Stipulated Facts, ¶ 23.[2] The bill of sale for that transaction provides:

> Lakewood agrees that CAM shall be fully authorized to use and/or sell any and all of said Motors at any time hereafter, and as to any of the Motors containing Lakewood's name or mark thereon, Lakewood hereby grants an unconditional irrevocable license to CAM to sell said Motors separately and not as part of fans, to any customer whatsoever, or to use said Motors by incorporating them into fans.

DX 6. See Barron, pp. 175-177; Marshall, pp. 8-9.

Other than this transaction, Lakewood acquired no 20" box fans from CAM after December 17, 2008. Stipulated Facts, ¶ 24.

On February 19, 2009, an involuntary bankruptcy petition was filed against Lakewood. CAM was aware of this petition within days of its filing. Stipulated Facts, ¶ 22. Once CAM knew that Lakewood was insolvent, it no longer expected Lakewood to purchase box fans, "[u]nless they got some infusion of capital." Herman, p. 102, lines 14.

CAM Attempts to Acquire Lakewood, and at the Same Time Begins Setting Up Its Own Box Fan Company

In late December 2008, a meeting took place among Herman, Skinner and Lakewood's CEO, James Ross. Ross came to CAM's manufacturing facility, told Herman and Skinner that Lakewood was having trouble paying for the motors it had ordered, and asked if CAM would be interested in investing in Lakewood. CAM was interested. Herman, pp. 48-49.

---

[2] Stipulated Fact ¶ 23 states that the number of fans in the barter transaction was 14,440. The bill of sale at DX 6 indicates that the number was 14,469. The difference is immaterial, but noted here for completion and accuracy.

For the same reasons that he wanted to manufacture fans, Herman believed that

> [a]ctually owning the product was very intriguing, and so we pursued that
> vigorously. We met with them at their facility. We did our due diligence
> to – we looked at the balance sheet; we looked at their liabilities; we
> looked at not only their trade liabilities, but their insurance liabilities; we
> looked at their sales. And we ultimately made an offer.

Herman, p. 49, lines 8 -15.

This process, resulting in an offer to purchase stock, took about six weeks.

Lakewood's board of directors turned down the offer. Barron, p. 173.

After the bankruptcy filing, CAM followed two parallel paths. On the one hand,

it pursued the possibility of purchasing Lakewood. CAM "approached the trustee to try

to buy the assets of Lakewood to ultimately secure that and potentially become

Lakewood." Herman, p. 55, lines 4-6. Eventually CAM was the stalking horse bidder at

the bankruptcy auction for Lakewood's assets, extending a bid in the amount of

$1,791,175.50 to purchase Lakewood's operating assets. See Stipulated Facts, ¶ 32.

CAM's other path was setting itself up as a fan company, without purchasing the

Lakewood name and materials. "We were confident that we were proficient at producing

these box fans now. We had the knowledge and the skill set, and we were going to take a

new path." Herman, p. 52, lines 6-9.

As early as February 26, 2009, CAM began exploring opportunities to sell 20"

box fans to individuals and entities other than Lakewood. Stipulated Facts, ¶ 25;

Herman, pp. 53-54; Skinner, p. 159. Although it initially sold box fans under the

Lakewood brand, CAM's "belief was that at a certain price level, people don't care what

brand is on there, whether it says Lakewood or whether it says anything else." Herman,

p. 104, lines 12-15. This is not a universal belief. "Brand is important to how anything

sells," including box fans. Martin, p. 268, lines 11-12. "If two products are on the shelf

- 22 -

with the exact same price, the brand the consumer recognizes or trusts will win that

purchase." Martin, p. 268, lines 21-24.

Almost immediately after the involuntary petition was filed, the manufacturers'

representatives who had been dealing with Lakewood approached CAM about selling

fans to their customer base. Herman, p. 54. CAM did not share this information with

Chapter 7 Trustee Szilagyi or with Wells Fargo Bank, Lakewood's largest creditor.

Herman, p. 85.

Martin explained the crucial role of a manufacturer's representative in the

relationship between a manufacturer and a retailer:

> A manufacturer's representative is a representative, a person, a
> salesperson that either has sought us out or we have sought out because of
> their relationship with a key account, whether it be a Lowe's, or a Home
> Depot, or Menard's, for instance. That person will have a relationship
> with them, and then come and broker, if you will, or sell our products for
> us. . . . Having a manufacturer's rep is critical for the cost equation,
> obviously, because you can't -- we can't, as an organization, you know,
> want to afford to carry that many 40 plus salespeople that are on the
> streets. So we hire rep groups to go out and solicit this business, and we
> pay them a percent of what they sell. That way we're not carrying the
> overheads of salaries. . . . [T]hey provide relationships. Relationships are
> critical in any selling process. . . . Manufacturer representatives will
> normally sell many different product lines. So, for instance, if they're
> selling to Lowe's, this particular manufacturer's rep may carry fans from
> JCS, and toothbrushes from another manufacturer, and Solo cups from
> Solo. So because they're a stop shop or a -- not a one stop, but they carry
> a broad array of products, they're important to that retailer. And so it
> gives them that single line of communication. And, obviously, over the
> years, they form that trust with that representative.

Martin, p. 264, lines 15-22; p. 265, lines 1-8, 11-12 and 20-25; p. 266, lines 1-5

(questions omitted).

Jeff Warner was the manufacturer's representative for Sears/Kmart. A week after

the involuntary filing, he sent a document to Skinner so that they could explore what

might be done to protect Sears/Kmart, to explore CAM's options, and to deal with open

items going forward. Skinner, pp. 162-165; PX 48. Warner indicated that Sears wanted to buy 50,000 Rain Guard fans. CAM did not share this document with the Trustee, who would not be appointed until approximately two weeks later. Skinner, pp. 166-167; PX 48. This was "a very fluid situation. It was a situation that we had not encountered before. We were exploring our options." Skinner, p. 168, line 25 – p. 169, line 2.

On March 10, 2009, CAM issued Purchase Order 14591 in which it ordered 90,720 box fan motors bearing the Lakewood Trademark from Supreme Industrial Motor, Ltd. (the "SIM Motors"). DX 25. CAM received the SIM Motors after the Supply Agreement was rejected. Stipulated Facts, ¶ 27. It used these motors in its box fan production and sold those box fans to third parties. Marshall, pp. 9-11. CAM paid half of the balance due on March 11, 2009, and the other half on June 4, 2009. Marshall, pp. 24-25.

CAM purchased 107,520 additional cord sets for use in 20" box fans by purchase orders issued on March 25, 2009 (35,000 cord sets) and April 27, 2009 (72,520 cord sets). DX 26 and 27. Payment for these cord sets was made in full in the amount of $60,000 on March 25, 2009. Stipulated Facts, ¶ 28; Marshall, pp. 13-15. Even though CAM paid for the entire order on March 25, a purchase order was issued that day for only 35,000 cord sets because that "was all that was available at the time." Marshall, p. 16, lines 3-4.

By mid-March, CAM had hired a former Lakewood employee to help liquidate and sell both the box fans that it had in inventory and those box fans that it was producing from the raw materials on hand. Herman, p. 54; p. 61.

Before the end of March 2009, CAM sold 1,260 box fans to Albertson's.

Herman, p. 57.

<u>Szilagyi Briefly Operates Lakewood</u>

An order for relief was entered in the Lakewood bankruptcy case on March 10,

2009, and Gregg Szilagyi was appointed as the Chapter 7 Trustee for Lakewood

immediately afterward.  Szilagyi, p. 47; <u>In re Lakewood Eng'g. & Mfg. Co., Inc.</u>, 09 B

5320, Order for Relief, ECF No. 27 and Letter of Appointment, ECF No. 28.

In the middle of March, Szilagyi "sought court approval to operate the estate on a

limited basis to sell off the finished goods inventory, the heater and fan inventory, and to

collect accounts receivable and to continue to maintain the facilities of the company on

an ongoing basis."  Szilagyi, p. 50, lines 2-7; Emergency Motion of Trustee For

Authority to Operate Business on a Limited Basis, Compromise Debtor's Accounts

Receivable, and Sell Inventory Subject to Security Interest of Wells Fargo Foothill, Inc.,

09 B 5320, ECF No. 34.  His motion to do so was granted.

Szilagyi learned during his first week as trustee that Lakewood had a relationship

with CAM, and that the Supply Agreement existed.  Attorney Janice Alwin called him,

indicated that she was representing CAM and advised Szilagyi that CAM had done some

contract manufacturing.  Alwin told Szilagyi "that there had been discussions with

Lakewood about acquiring Lakewood's assets or purchasing the company prior to the

involuntary petition, and that [CAM] may have an interest in purchasing assets from the

estate."  Szilagyi, p. 52, lines 8-13.  Alwin did not inform Szilagyi that CAM was

currently manufacturing for Lakewood, and they did not discuss any fans that CAM had

in inventory with the Lakewood brand.  Szilagyi, p. 52.